# DEAN L ROSEN, Psy.D.
## CLINICAL PSYCHOLOGIST

### Psychological Report

**Name:** Jared Diehl
**Birth Date:** 6/26/1996
**Exam Date:** 6/14/2022
**Exam Procedure:**   Clinical Interview with Jared Diehl
Wellness Assessment  Adult version
Adverse Childhood Experience Questionnaire (ACE)
Minnesota Multiphasic Personality Inventory-2nd Ed. (MMPI-2)
Sexual Violence Risk Assessment (SVR-20)

### Referral:

Jared Diehl is a 26-year-old single White male who was referred for psycho-sexual evaluation by Joe Flees, the attorney representing him on a charge of receipt of child pornography filed in the Eastern District of Missouri Federal Court. A warrant was served on September 16, 2020. He believes the first offense occurred in 2017, with a second incident  in 2020 during the pandemic. He was indicted in March of 2022 at which time he was released on bond with the stipulation of electronic monitoring.  He is also mandated to attend pre-trial sexual offender support services. Mr. Diehl first consulted my office on March 28, 2022, for an initial assessment. He has been seen for individual psychotherapy since then, both individually and with his parents. Psychological assessment is now requested to determine if he presents any risk of sexual violence and to determine if there are any mitigating circumstances or co-existing psychiatric disorder that would require treatment.

### Qualifications of the Examiner:

Dean L. Rosen is a clinical psychologist in independent practice, licensed in the state of Missouri since December of 1979. Dean Rosen obtained the Doctor of Psychology degree (PSY. D.) in clinical psychology from the University of Illinois -- Champaign/Urbana in January of 1977. Dr. Rosen practices at 745 Craig Road. in St. Louis County, Missouri. Dr. Rosen performs this psychological examination upon the request of his attorney and is thus covered under the rules of confidentially referred to as "work product" as Mr. Flees' expert witness.   Dr. Rosen has been performing psycho-sexual evaluations for the Family Court and for criminal defense for the past 15 years.  He has testified in both federal court and state criminal court on these assessments. He also has provided treatment to these offenders both pre-sentence and post-sentence as well as training other professionals on sex offender assessment and sexual addictions.

### Significant Social History:

**Education history** indicates graduation in 2015 from Fort Zumwalt West High School in St. Charles County where he had an IEP for education accommodations due to his pronounced anxiety.  He required additional classes to graduate following completion of his senior year.  He reported speech delay and speech therapy in elementary school.  He had accommodations to

745 Craig Rd  Ste 104    St. Louis, MO   63141    tel (314) 872 0288   fax (314) 872 3934   RosenPsyd@att.net

Ex. 1

Jared Diehl report                                                                      page 2

leave classes early so that he did not have to encounter crowds of students in the hallways between classes, and he was able to take tests by himself. He managed only a 2.1 GPA in high school out of a 4-point system. He did much better in college and graduated summa cum laude from University of Missouri-St. Louis in 2021 with a BS degree in computer science, with a minor in mathematics, earning a 4.0 grade point average. While he participated in no extracurricular activities in high school due to his marked social anxiety, he was much more active in college activities including Student Government, Chess Club, and the Computer Club. He even organized competition events in Rubic's Cube.

**Employment history** indicates very recent employment with Amazon, working in their warehouse at night. He voluntarily left his previous employment with Infoscitex at the time of his indictment, fearing it would impact his obtaining a necessary security clearance. He worked there 7 months as a software engineer and reported marked satisfaction with that job and the high salary earned for a first job in his field. He had several jobs while attending college, including Walmart and McDonalds, working full time hours to support himself in college. He reported no problems on the job with co-workers or supervisors and no pattern of disciplinary job write-ups, except for one incident at Walmart when he was written up for a safety violation. He has filed no grievances or lawsuits against employers and has never filed for personal bankruptcy. He is in no significant consumer debt and reports a good credit score. He remains very discouraged about the likelihood that he cannot work for major corporations who might use his computer skills if he has a felony record for child pornography.

**Medical history** is not significant or contributory. He is under no current medical treatment and takes no prescribed medication. He presents as quite thin but stable in weight at 120 pounds on his 5'9" frame. He gives no history of seizures, loss of consciousness, or head injury. He maintained health insurance through his father's employment but is now covered by his employment with Amazon.

**Psychiatric treatment history** is significant chiefly for outpatient treatment in adolescence and young adulthood at the Crider Center where he was prescribed the anti-depressant Lexapro for marked social anxiety and the stimulant Adderall for control of attention deficit disorder. He was previously under the care of Dr. Rhamani while he was in high school. He is taking no psychiatric medication currently. He reports taking Adderall at the time of his offense to increase his mood during the restrictions of the COVID pandemic. He had a prescription for the medication for about five years but didn't take it daily. He reports that he was never diagnosed with autism, but it had been suggested to him that he be assessed for it. He did qualify for Vocational Rehabilitation services which paid for much of his college expense. He currently attends a mandated sex offender pre-trial support group twice a month, with an additional individual session once a month, under the auspices of Jenny Tune.
She is a licensed professional counselor who contracts with federal pre-trial services to provide this service. He finds the group somewhat helpful, but finds it depressing to listen to other group members complain about coping with the stress of prosecution. He contacted my clinical practice at the recommendation of his attorney, shortly after he was indicted. He was first seen on March 28, 2022. He is compliant with scheduled appointments and is seen twice a month for individual psychotherapy. In our sessions he expresses much frustration at losing the job and the career he had been preparing himself for throughout his college career and expresses marked hopelessness that he can find a job post-prosecution in his chosen field.

**Alcohol and drug abuse history** is not significant or contributory, with only rare consumption of alcohol currently and no past patterns of abuse. He never drank on a daily basis and reports

Ex. 1

Jared Diehl report                                                                    page 3

no binge drinking. History is negative for common problems and patterns seen in substance abuse such as DWI charges, missed work, consumption before school, blackouts, attendance at AA or formal substance abuse treatment programs. He gives no history of using marijuana, heroin, cocaine, amphetamines, prescription opiates or hallucinogens like LSD.

**Childhood and adolescent behavior history** is not significant for marked conduct or behavior problems. He gives no history of school expulsion, school suspensions or fighting. He did show significant truancy due to his anxiety and avoidance, with some in-school detention for missing classes. The juvenile court was never brought into his childhood or adolescence, and he gives no history of stealing, shoplifting, or running away from home. Childhood history is negative for common precursors to adult anti-social personality such as diagnosed hyperactivity, fire-setting, cruelty to animals, or bed-wetting except for very infrequent episodes up until age 10.

**Prior criminal arrest and conviction history** is not significant except for one incidence of vandalism in 2018 though he was not prosecuted. He attributed this to driving an ex-girlfriend's friend who was seeking revenge on the former girlfriend's car. He reported only one traffic ticket in 2018 but not since, and his driver's license has never been suspended or revoked.

**Trauma history** is not significant or contributory. He gives no history of physical abuse, sexual abuse or emotional abuse. He witnessed no domestic violence, and he had no close friends or family impacted by gun violence or suicide. He did report some bullying in school from peers and much peer rejection.

**Family background** is significant for some disruptions with the divorce of his parents in when he was 12 or 13 but they reconciled again two years before divorcing in 2017 when he was 21. His parents separated when he was in middle school, and he maintained regular contact with both parents but also had to transfer schools several times which was very stressful for him. His father is an IT professional at Mastercard. His mother is on disability from a back injury. His mother did come out as a lesbian when the marriage ended and has remarried. His mother and her wife are living with his father in the former marital home temporarily in suburban O'Fallon, Missouri. He has two younger brothers who are doing well. He has not experienced the deaths of any important people growing up except a great-grandmother. Child protective services were never called to the home. He witnessed no domestic violence. Police were only called to their home once for a marital conflict. Family history is negative for alcohol and drug abuse, mental illness or criminality. He described a very predictable and structured home growing up, with very supportive parents. They recognized his differences from other children but accepted him as he was and did not excessively push him. He did report a late onset of puberty and was always one of the smallest boys in school. He did report some peer bullying and rejection, stating he had no friends in school growing up until he entered college. He continues to live in his father's home, with sufficient privacy for himself in the basement. He described a family that was not very open growing up, and he saw himself as maintaining much distance from family members. The family was not strictly religious growing up, but his father and father's family were more observant Lutherans.

**Marital and relationship history** indicates he has never married and has fathered no children. He has been in some prior relationships with women but is in no current relationship and has not been in one for the past three years.

**Psycho-sexual History:**

Ex. 1

Mr. Diehl's early sexual development is unremarkable. He reports no sexual play with peers in childhood and a family that didn't talk about sex. They did not tell sexual jokes in front of the children and there was generally no pornography in the home. However, he was shown pornography by a peer around age eleven. The family was appropriately modest in public spaces and respected his privacy in the bathroom and his bedroom. He learned about the facts of sexuality in school classes and satisfied his curiosity with looking up information on Google Search. Around 10 or 11 he discovered masturbation on his own and was not sure how he felt about it. He remembers feeling attraction to the opposite sex around age 12 in 6th grade. He reported no same-sex attraction or experience in childhood or adolescence. He did not have "girlfriends" in middle school or high school and did not date then. He reported a first girlfriend in college and his first sexual intercourse at age 19. He described mixed feelings about the experience. He engaged in no exhibitionism or voyeurism in childhood or adolescence.

Mr. Diehl reported viewing some pornography on-line in early adolescence, by sixth grade, viewing still pictures about once a week. He stated his pornography viewing wasn't generally more than an hour a day so that he did not see himself has having a compulsion or addiction. He reports some fascination with what is taboo. His parents did take away his computer in adolescence because he was looking at pornography, monitoring his computer use until he was 18.

Mr. Diehl reported 3 intimate adult relationships in his life, with the last one in 2019. His longest relationship lasted two years. He attributed the breakup to her dissatisfaction that he was not spending enough time with her when he was devoted to his studies and his job while in college. He reported no unusual sexual pre-occupations in his young adulthood. He had no interest in role play during sexual encounters and had no fetishes or paraphilia that were necessary for arousal. He did not attend adult "strip" clubs. He patronized no prostitutes and did not seek erotic massages. He reported no interest in or use of violence during sexual encounters. He reported no sexual dysfunction in his relationships. His long-term girlfriend did cheat on him during the relationship and that was "heartbreaking" for him. This girlfriend would accuse him of cheating, which he has denied. He stated he still finds it hard to get over. He reported one same-sex encounter which he entered out of curiosity so he could say he tried it but ended up regretting the experience and not particularly enjoying it.

Mr. Diehl reported looking at pornography regularly but not daily in adulthood. He would find images on the Reddit site but did not post or share images and did not engage in chat with others. He states he wouldn't even read the comments or make comments. He states he never paid for sexual content on the Internet and did not seek violent content. He did not generally use file sharing programs but did visit a website where illegal images were posted, claiming he knew they were illegal but didn't think that looking at those images was a crime. He also claimed that he was interested in how the FBI could identify people downloading child pornography. He claimed the illegal images he did download were deleted before police took his computer and that he looked at such images only for a very brief period of time. However, because he looked at videos, he was considered to have a high number of images given the way videos are judged in the federal judiciary. While he minimized his pornography use in the interview somewhat, he did admit trying to stop on occasion, for as long as several months. He claimed he had too much to do to look at pornography on a daily basis. He denied any interest in pre-pubescent girls.

In conclusion, Mr. Diehl does not meet criteria for diagnosing pedophilia, which is a primary or exclusive sexual interest in children under 12, before the onset of puberty. He does appear

Jared Diehl report                                                                                  page 5

interested in and capable of adult heterosexual relationships. It is less clear how much his pornography viewing was compulsive.  He is deeply shamed about it.


**Sexual Violence Risk Assessment:**

    The **Sexual Violence Risk-20, SVR-20,** is an assessment tool that is frequently used in predicting future risk of sexual violence recidivism.  It is a series of 20 items that have been shown to predict recidivism risk for sexually violent offenders who have been convicted of contact offenses.  It might also predict problems following through on the restrictions placed on sexual offenders in the community.  The SVR-20 is a checklist filled out by an examiner, using the known history.  It is not a self-report measure.  It does not yield a numerical score and does not yield a statistical risk of re-offending.  Rather, it is a tool that guides an examiner in making an overall assessment of the individual, taking into consideration static features about the offense and prior history and non-static features, such as recent improvements or deteriorations in functioning.

    The 7 items that assess for characteristics of the index offense and sexual offense history are the best predictors of the risk for sexual violence recidivism or re-offending.  None of those 7 items would be scored as present in Mr. Diehl's history and what is known about his index offense, which is a non-contact offense.  He gives no history of a high density or number of sexually violent offenses, multiple offense types, physical harm to victims, use of weapons or threats of death, escalation in frequency or severity of violent offenses, extreme minimization or denial of offenses (though he was initially more defended and did not immediately admit to his offense), and attitudes that support or condone offenses.  From these items alone, there is only a very small risk of future violent sexual offending with contact offenses.  His very negative judgments about child pornography in general have made it more difficult to initially admit to his offense since he does not want to see himself as someone who would make and distribute child pornography.

    The next 11 items are grouped under the concept of psychosocial adjustment, with the premise that those whose lives or past history are more unstable are more likely to experience the emotional stress or personality pattern that can lead to re-offending.  Mr. Diehl did not score in the positive direction on most of these items.  He did not show a pattern of marked or exclusive sexual deviation (defined as primary or exclusive interest in pre-pubescent children) and he was not a victim of childhood abuse.  Most importantly, he does not show evidence of psychopathy or anti-social personality. He does not have a history of mental illness of the psychotic variety, but he has struggled with marked social anxiety in the past and would meet criteria for diagnosing autism spectrum disorder currently. He has had no substance abuse problems in the past or currently. He does not show evidence of current suicidal or homicidal ideation but admits to past suicidal thoughts in adolescence when he was more socially isolated. He has not had problems sustaining long-term employment.  He has no history of past non-sexual violent offenses, and no history of non-violent offense other than a vandalism arrest that was not prosecuted.  He has had some sustained long-term intimate relationships but has not met criteria for a two-year sustained relationship. He has not shown any pattern of supervision failure in this lengthy period during the investigation and prosecution. In summation, this is a very emotionally stable and socially productive individual.

    The third group of items on the SVR-20 deals with future plans and can influence adjustment and offense patterns in the community.  Again, Mr. Diehl did not show evidence of lacking realistic plans following his sentence but recognizes that he may not be able to work in the

**Ex. 1**

Jared Diehl report                                                                              page 6

software engineering field he aspired to before the indictment. He does not demonstrate negative attitudes toward intervention, as evidenced by his openness to this evaluation and by his positive experience with therapy addressing sexual addiction and sexual offending.

Thus, there is little in Mr. Diehl's history, interview, or psychological testing that would indicate he presents any particular risk of violent sexual offending or contact offenses if he is maintained in the community following sentencing. The presence or absence of psychopathy or antisocial personality is the best predictor of incarceration for probation failures, and he shows no such tendency. His financial independence will also serve him well post-sentencing, reducing the stress of finding suitable employment with a felony conviction. His autism spectrum disorder would predict a willingness to accept and follow the rules of community supervision but might have made it more difficult for him to fully accept the seriousness of the sentence he is facing, since he needs to see himself as a "good person" who would not commit a heinous offense knowingly.

**Autism Spectrum Disorder Assessment:**

Mr. Diehl was not formally diagnosed previously with Asperger's Syndrome, now known as Autism Spectrum Disorder (ASD) but he does give significant history to make this diagnosis. He reports that a counselor told him he probably had Asperger's when he was 17 but there was no follow-up or education for him and his family on the disorder. He demonstrated some neurodiversity in that he had marked attention deficit disorder which often co-occurs with ASD, He took Ritalin in childhood, but it was discontinued when he did not tolerate it well and would have difficulty maintaining weight on it. He did self-medicate with excessive caffeine consumption. Along with the ASD, he showed other developmental deficits, with some speech delay and pronunciation problems in elementary school so that he did attend remedial speech classes. Typical of people on the autism spectrum, he could become easily overwhelmed, with very poor frustration tolerance and marked temper tantrums in childhood. He struggled with issues of autonomy so that he could not go along with suggestions or requests and became more oppositional and resistant. He had difficulty in new situations and adjusting to changes in his life, exacerbated by his parents separating when he was in middle school. He coped with his excessive anxiety by engaging in some rituals of re-touching objects or other repetitive motions. He also gives a history of marked social anxiety growing up, and panic attacks currently. He always had difficulty relating to peers and engaged in much social isolation until he went to college. There he connected with like-minded individuals through his interest in computer programming. He showed evidence of sensory integration problems in his early years so that he was very picky about the clothes he wore, finding some textures very uncomfortable for him. He was equally picky over foods, severely limiting the foods he would eat because of problems with the texture of some foods. He showed evidence of misophonia, an extreme reaction to some sounds and noises. Thus, he was easily annoyed by others at the dinner table with the sounds they would make. Consequently, he would often eat in his own room. He reported delayed puberty adding to his self-consciousness in adolescence. He experienced much dysphoric mood in adolescence, with very negative thinking. Typical of people on the autism spectrum he would "over-think", leading him to much pessimism and worry over events that were unlikely to happen. Because of this combination of anxiety and depression, he avoided school and had marked problems with truancy in high school. He under-achieved in high school compared to his strong achievement in college. He demonstrated very un-even cognitive skills that is also seen in ASD. Typical of some people with ASD he was very weak in language arts but very strong in mathematics, studying calculus in middle school. He did have an IEP in high school that allowed

**Ex. 1**

Jared Diehl report                                                                    page 7

him to take tests in distraction free environments and to have some tests read to him. Typical of ASD, he would hyper-focus on topics he was interested in and have much difficulty motivating himself to do schoolwork he was not interested in. He found mathematics satisfying because it followed logic and rules. He found people difficult to understand and would show little interest in others. He was interested in puzzles that could be solved but not stories about people. He thought it was rude to ask people questions about themselves because he doesn't like talking about himself. He also has much difficulty maintaining eye contact in conversations with others, all typically seen in ASD. He is much more interested in ideas than in people. He took on the "little professor" role, explaining things to adults and not recognizing when he might be boring others. Because of his general anxiety and excessive fears over new situations, he delayed obtaining his driver's license until age 19.

All of these very different symptoms and problems are seen in Asperger's Syndrome or Autism Spectrum Disorder. The diagnosis is important to help him understand himself better and to help his family understand him. The information should also help the criminal justice system in both considering this as a mitigating circumstance and in understanding his interactions with authorities if he is under community supervision. People on the autism spectrum are generally "rule bound" and find structure and rules helpful because it allows him to know what to expect in any situation. At the same time, this developmental condition may make adjusting to new circumstances more difficult for him as he can become more easily overwhelmed as he comes to accept the consequences of his criminal prosecution. In addition, he might have some difficulty taking in new ideas and conceptions that will be brought up in sex offender treatment. In addition, he may have great difficulty relating to others in a group treatment and showing any interest or understanding of other people in the group.

**Behavioral observations and mental status examination:**

Mr. Diehl was evaluated in my office, coming by himself and using his own transportation. He was dressed in casual attire, with good grooming and hygiene. He cooperated fully in the evaluation. He understood the purpose of the evaluation and the limits of confidentiality as explained to him before he then read and signed an informed consent form. He related easily to the examiner in a pleasant and open manner as he had already established a positive therapeutic relationship. His memory for recent and remote events was intact. He appeared to be a reliable informant though no other records were reviewed to corroborate his statements. His sexual history appeared to be open and honest, and within the parameters of what might be expected given his criminal charges of child pornography possession.

Throughout the evaluation his thoughts were logical, consistent and coherent. There was no evidence of loose associations, tangentiality, circumstantiality, push of speech, grandiosity, religiosity, delusions, hallucinations or other psychotic thought process. At times his thinking appeared more concrete and simplistic when he focused on how he viewed his offense versus how the criminal justice system will view it. Thought content was negative for current suicide or homicide. He does show some hopelessness in that he cannot see how he might rebuild his life if he cannot work in computer science for corporations. He does show rigidity in his thoughts, so it was more difficult for him to take in new ideas. His affect was appropriate to the content of his thoughts and appropriately modulated and controlled. His affect was somewhat constricted, though he showed emotional pain at times in his eyes. His mood was mildly anxious over the uncertainty of his criminal prosecution. He displayed no unusual behavior or mannerisms other

**Ex. 1**

Jared Diehl report                                                                page 8

than his avoidance of eye contact and flat affect. He displayed sufficient motivation and stress tolerance to complete the long interview and psychological testing.


**Symptom Report:**

   Mr. Diehl reported some symptoms expected in a crisis and some symptoms expected of someone on the autism spectrum in a structured symptom interview. He reported no current sleep problems, attributing improved sleep to not looking at computer screens for as long as he used to. He reports adequate appetite and stable weight. He could accept his body shape and size. He described his energy as variable but "mostly okay". He saw no marked change in his humor but appeared quite serious throughout the evaluation. He reported no crying spells. He reported adequate concentration if he is not exposed to extraneous noise. He described much sensitivity to bright light and certain noises. He reported no problems with memory. He claimed he thought his life would "work out" and that he can make his life better, but this contradicts much of what he shared in the interview and prior therapy sessions where he displayed more hopeless and helpless ideation or thoughts. He acknowledged past suicidal thoughts in high school when he experienced more peer rejection and bullying but not currently. He reported no homicidal thoughts or intents. He reported no increased irritability and no problems currently with anger management, stating he "stays quiet and thinks about solutions". He does acknowledge excessive self-blame and at times blames others. He acknowledges panic attacks but not recently. He does report generalized anxiety but no pattern of physical symptoms in response to stress. He reports much intrusive and repetitive thinking, especially after his arrest. He does not report social withdrawal currently but only identifies his immediate family as his support system. He does add that they are "super supportive". He could identify some positive qualities within himself, taking pride in his good time management and analytical approach to problem solving. He wasn't sure how others saw him but then stated they might see him as very motivated to achieve goals.


**Psychological Test Results:**

   The **Wellness Assessment** is a self-report measure filled out before the interview. Of 11 common symptoms and problems, he checked only two symptoms, feeling hopeless about the future and feeling fearful or afraid, describing them as bothering him only "a little". He did not check difficulty at home, socially or at work as bothering him at all. He agreed with statements that he feels good about himself, can deal with his problems, is able to accomplish the things he wants, and has friends and family he can count on for help. He rated his health as excellent and reported no visits to physicians in the last six months and no concern about alcohol or drug use within himself or by others in the past month. Given the current disruption in his life some of his self-report appear accurate but there might also be some minimization on disruptive emotions, consistent with his constricted emotional style in the interview and his general avoidance of emotional topics.

   On the **Adverse Childhood Experience (ACE) Questionnaire,** Mr. Diehl checked only 1 of the 10 items assessing negative experiences that have happened to him in his childhood, referring to his parents' divorce. When individuals check four or more adverse experiences on this questionnaire, they have many more problems in adulthood with addictions, physical health, or emotional health. While a score of 1 on this questionnaire is not sufficient to predict adult

**Ex. 1**

problems with addictions or emotional health, there could be more of an impact on him from peer bullying and rejection, which this instrument does not address.

Mr. Diehl demonstrated sufficient educational attainment to read and comprehend the items on the **Minnesota Multi-phasic Personality Inventory 2ⁿᵈ ed (MMP-2).** He followed instructions and answered all 566 true-false test items. The three validity scales of the MMPI-2 showed a pattern of some openness in admitting to unusual thoughts or experiences but marked defensiveness in admitting to common human foibles and moral failings. This kind of defensiveness is not unusual when the test is taken in forensic settings as a naiver subject might try to control his self-presentation to affect the recommendations from the assessment. This is consistent with his overall defensiveness in discussing his pornography consumption, suggesting he needs to see himself in a more conventional light and has more difficulty acknowledging his darker or less socially acceptable desires and behaviors. It is less clear how much this defensiveness is impacting his clinical scales, but they should be interpreted with some caution.

Among the 10 Basic Scales of the MMPI-2, Mr. Diehl showed elevation on only one scale in the clinically significant range, above a T score of 65. This elevated scale 0 would indicate a more introverted person who might be more comfortable alone and might be less comfortable in group situations, including group therapy. His milder elevations on scales 7 and 8 (at T scores of 60) would indicate someone who is anxious, ruminates and might have some unusual thoughts. The clinical literature for this pattern of scores would suggest an "individual in acute psychological turmoil", filled with "anxiety, tension, and excessive rumination". There might be excessive "introspection and over-ideation" so that he might appear confused as well as highly emotional. Such individuals will lack confidence and might feel inadequate in heterosexual relationships. In addition, such individuals can be "typically conscientious", when "fears and excessive worry often lead them to have only mediocre or poor achievement". Unlike his more positive presentation on the Wellness Assessment, this code pattern on the MMPI-2 would suggest a "profoundly negative self-image". As such he might be "constantly on edge, as if anticipating a disaster". He might also be "extremely quick to feel criticized, judged, or somehow defective, relative to others". Individuals with this profile often have a "deep sense of being fundamentally damaged" so that they are constantly apprehensive that somehow, they are going to be discovered and humiliated because of their perceived defects". His lower score on scale 3 (T score of 40) would suggest an individual who "sees life realistically and may come across as somewhat caustic and blunt". Their interests tend to be very narrow. They may be seen as cynical and even misanthropic, "seeing life as full of hardships". They "will not commit to doing something they do not want to do" and "will not give compliments unless they genuinely mean them". His scale 4 score would not indicate any impulsiveness or authority problems.

Among the 19 Supplementary Scales of the MMPI-2 scored for this evaluation, Mr. Diehl's profile showed elevation on two scales in the clinically significant range, and milder elevations on several others that might have interpretive significance. His elevation on scale R (T score of 65) would indicate "a coping style emphasizing limited insight, (conscious) denial and rationalization, and decisions to limit self-disclosure". This style makes it more difficult to fully engage in psychotherapy, especially when painful and humiliating experiences would be discussed. These individuals are uncomfortable with emotions and emotionally charged material. They "prefer to operate in circumstances that are conventional, predictable, familiar and overlearned". In turn, this person might have limitations in their "capacity to be become aware of, identify, differentiate, and reflect on feelings". His elevation on the Si₁ scale would indicate more shyness and self-consciousness, contributing to his problems socializing when outside of his comfort zone or familiarity with others. His low score on the Es scale (T score of 30) would indicate marked

**Ex. 1**

Jared Diehl report

problems with stress tolerance so that he can become easily overwhelmed by stressors that others could handle.  Such individuals can become more confused in the face of stresses and become upset by "seemingly minor matters".  They are "inhibited, indecisive, and procrastinating and more rigid in their outlooks, in their choices of action, and their approach to problems".  His milder elevations on the MDS scale and OH scale ( T scores of 60) would indicate more family conflicts and more difficulty accepting and expressing hostility so that he could let resentments build up.  His very low scores on the Do and GM scales (T scores below 35) would indicate more passivity, procrastinating, lack of confidence, and feelings that everything is out of his control so he may have more difficulty taking directed actions to solve his problems.

Overall, this MMPI-2 profile presents a picture of an individual who is very introverted, has difficulty taking charge of his life, with much anxiety and rumination as well as difficulty facing and expressing feelings.  These interpretations from the clinical literature on the MMIP-2 are consistent with his history and presentation in the interview as well as what I have learned about him in our psychotherapy sessions.  These symptom patterns are also all consistent with a diagnosis of Autism Spectrum Disorder.  While the MMPI-2 was not designed to predict sexual offending, there are some profiles seen with the test that are common in a sex offender profile.  Mr. Diehl did not show any of those profiles so that he is not seen as narcissistic, impulsive, or likely to physically act out his fantasies.  Rather, he is someone who can retreat into fantasy and fantasy offenses on the Internet as opposed to contact or violent offenses against victims.  These interpretations, including all quotations, are taken from Friedman, Lewak, Nichols and Webb's *Psychological Assessment with the MMPI-2*, published by Lawrence Erlbaum Associates in 2001.


**Summary and Conclusions:**

Mr. Diehl is a young man who was not previously diagnosed with Autism Spectrum Disorder (or Asperger's Syndrome as it was formerly known) but his history and presentation is entirely consistent with that diagnosis.  As such he had much difficulty socializing with peers growing up and was quite isolated from peers and bullied by peers.  He did not make real connection with peers until he attended college and met more like-minded students through his interest in computer programming.  His Autism Spectrum Disorder can lead to more rigid thinking.  As a result, he is having a great deal of difficulty imagining how he can rebuild his life following prosecution.  He also has more difficulty recognizing and accepting how seriously his offense is seen by the criminal justice system since he doesn't see himself as a violent person who would harm others.  He is cooperating with the restrictions placed on him pre-trial but is having more difficulty utilizing the mandated group support sessions.  He is cooperating with the psychotherapy he is voluntarily participating in but has more difficulty facing and expressing his feelings and coming to accept his actions that have led to his current prosecution.  Over time, he has come to reduce his defensiveness and face his actions.

Nothing in this assessment indicates he is a primary pedophile (meaning primary or exclusive sexual interest in children 12 and under).  Nothing indicates that he has any marked risk of violent sexual offending in a contact offense. His Autism Spectrum Disorder should be considered a mitigating factor in assessing an appropriate punishment for his offense.  At the same time, it should be noted that people on the Autism Spectrum are known to be "rule bound".  Thus, there will be a strong likelihood of following the rules of probation or parole supervision, even if he may personally believe the restrictions are not necessary to keep him from sexual violence.

Ex. 1

Jared Diehl report

Mr. Diehl has some strengths that will help him cope with the aftermath of prosecution. Most importantly, he has a very supportive family. He has stable housing with his family.  His family does see the importance of his seeking psychotherapy treatment.  He does have very marketable skills in computer programming, and he has a strong work ethic.  He does not have any substance abuse problem or an anti-social personality. He has had some intimate adult sexual relationships but is equally content when not in a relationship. And he should be able to follow through with any restrictions placed on him, post-sentencing. He is also making progress in developing remorse for his actions and coming to understand the harmfulness of his actions. Thus, overall, his prognosis for future adjustment is quite positive.

**Dean L Rosen, Psy.D.**
**Clinical Psychologist**
**Licensed in Missouri**

Ex. 1